IN THE SUPREME COURT OF THE STATE OF MONTANA

2008 MT 296

_____

STATE OF MONTANA,                                    No. 05-676

        Plaintiff and Respondent,

   v.

MICHAEL THADDEUS GOETZ,

        Defendant and Appellant.


_____

STATE OF MONTANA,                                    No. 05-539

        Plaintiff and Respondent,

   v.

JOSEPH PATRICK HAMPER,

        Defendant and Appellant.


_____



APPEAL FROM:    District Court of the Eighteenth Judicial District,
                 In and for the County of Gallatin, Cause Nos. DC-04-354 and DC-04-390
                 The Honorable Mike Salvagni, Presiding Judge.



COUNSEL OF RECORD:

       For Appellants:

            Peter B. Ohman (argued), Gallatin County Public Defender's Office,
            Bozeman, Montana

            Brian K. Gallik (argued), Goetz, Gallik & Baldwin, P.C., Bozeman,
            Montana

For Respondent:

Hon. Mike McGrath, Attorney General; Jim Wheelis and Mark Mattioli (argued), Assistant Attorneys General, Helena, Montana

Marty Lambert, County Attorney; Todd Whipple, Deputy County Attorney, Bozeman, Montana

_____

Argued and Submitted: July 19, 2006

Decided: August 20, 2008

Filed:

_____
Clerk

Chief Justice Karla M. Gray delivered the Opinion of the Court.

¶1 Michael Thaddeus Goetz (Goetz) and Joseph Patrick Hamper (Hamper) (collectively, the Defendants) appeal from the judgments entered by the Eighteenth Judicial District Court, Gallatin County, on their respective convictions for felony criminal distribution of dangerous drugs. Specifically, the Defendants challenge the District Court's denial of their motions to suppress evidence. We reverse and remand.

¶2 We address the following issue:

¶3 Were the Defendants' rights under Article II, Sections 10 and 11 of the Montana Constitution violated by the warrantless electronic monitoring and recording of their one-on-one conversations with confidential informants, notwithstanding the confidential informants' consent to the monitoring?

## BACKGROUND

¶4 In light of the identical primary legal issue raised in these two appeals, we consolidated the cases for purposes of oral argument and resolution. The following sets forth the relevant factual and procedural background of the individual cases.

### State v. Goetz

¶5 On May 19, 2004, Matt Collar (Collar), a detective with the Missouri River Drug Task Force (Task Force), made contact with Suzanne Trusler (Trusler), who previously had agreed to act as a confidential informant for the Task Force. Trusler informed Collar she had arranged to purchase a gram of methamphetamine from Goetz. Trusler then met with Collar and Detective Travis Swandal (Swandal) and allowed them to outfit her with a body wire receiving device. The detectives did not seek or obtain a search warrant

3

authorizing use of the body wire. Collar gave Trusler $200 with which to purchase the drug. Trusler then went to Goetz's residence and purchased methamphetamine from him. The conversation between Goetz and Trusler during the drug transaction was monitored and recorded by the detectives via Trusler's body wire. Goetz was unaware of, and did not consent to, the electronic monitoring and recording of his conversation with Trusler.

¶6 The State of Montana (State) subsequently charged Goetz by information with the offense of felony criminal distribution of dangerous drugs. In the information, the State listed Collar and Swandal as witnesses to be called at trial. The State also advised Goetz that it intended to introduce the tape recording of his and Trusler's conversation, and a transcript of the recording, into evidence at trial. Goetz moved the District Court to suppress the evidence derived from the electronic monitoring and recording of the conversation on the basis that it violated his rights to privacy and to be free from unreasonable searches and seizures as guaranteed by Article II, Sections 10 and 11 of the Montana Constitution. The District Court held a hearing and subsequently denied the motion to suppress. Goetz then pled guilty to the charged offense, expressly reserving his right to appeal the District Court's denial of his suppression motion.

### State v. Hamper

¶7 On August 4, 2004, Collar made contact with Chrystal White (White), who previously had agreed to act as a confidential informant with the Task Force. White informed Collar that she had arranged to purchase 1/8 ounce of marijuana for $50 from Hamper. White met with Collar and Swandal and allowed the detectives to outfit her with a body wire receiving device. Collar provided White with $50 to purchase the

4

marijuana. White met Hamper in a parking lot and purchased marijuana from him. The drug transaction took place in White's vehicle and the conversation between White and Hamper was monitored and recorded by the detectives via White's body wire. The following day, White again contacted Collar and informed him she had arranged to purchase another 1/8 ounce of marijuana from Hamper for $50. White met with Collar and Swandal and again allowed them to outfit her with a body wire. White then went to Hamper's residence and purchased marijuana from him. Again, the conversation between White and Hamper regarding the drug transaction was electronically monitored and recorded by the detectives via White's body wire. The detectives did not seek or obtain search warrants authorizing the electronic monitoring or recording of either conversation. Hamper was unaware of, and did not consent to, the electronic monitoring and recording of either conversation.

¶8 The State subsequently charged Hamper by information with two counts of felony criminal distribution of dangerous drugs. The State indicated its intent to call Collar and Swandal as witnesses at trial, and also indicated its intent to introduce the recordings of the two conversations—and transcripts of those recordings—into evidence at trial. Hamper moved to suppress evidence obtained via the electronic monitoring and recording of the two conversations on the basis that it violated his rights to privacy and to be free from unreasonable searches and seizures as guaranteed by Article II, Sections 10 and 11 of the Montana Constitution. The District Court held a hearing and subsequently denied Hamper's motion to suppress. Hamper then pled guilty to the charged offenses, expressly reserving his right to appeal the denial of his suppression motion.

5

## STANDARD OF REVIEW

¶9 We review a district court's denial of a criminal defendant's motion to suppress evidence to determine whether the court's findings of fact are clearly erroneous and its interpretation and application of the law correct. *State v. Copelton*, 2006 MT 182, ¶ 8, 333 Mont. 91, ¶ 8, 140 P.3d 1074, ¶ 8. Here, the parties do not dispute the District Court's relevant findings of fact. Consequently, we review only whether the court correctly interpreted and applied the law.

## DISCUSSION

¶10 **Were the Defendants' rights under Article II, Sections 10 and 11 of the Montana Constitution violated by the warrantless electronic monitoring and recording of their one-on-one conversations with confidential informants, notwithstanding the confidential informants' consent to the monitoring?**

¶11 The Defendants' motions to suppress relied primarily on *State v. Solis*, 214 Mont. 310, 693 P.2d 518 (1984), in which this Court determined that the warrantless electronic monitoring and recording of the defendant's conversations with an undercover law enforcement officer violated the defendant's rights under Article II, Sections 10 and 11 of the Montana Constitution, notwithstanding the undercover officer's consent to the monitoring. The State countered that, under *State v. Brown*, 232 Mont. 1, 755 P.2d 1364 (1988), the electronic monitoring of a conversation between two people, with the consent of one of them, does not constitute a search subject to the search warrant requirement.

¶12 The District Court recognized the conflict between *Solis* and *Brown*, and noted our own observation, in *State v. Hardaway*, 2001 MT 252, ¶ 51, 307 Mont. 139, ¶ 51, 36 P.3d 900, ¶ 51, of jurisprudential inconsistencies in privacy law cases from the mid-1980s through the early 1990s. Determining *stare decisis* required the application of *Brown*, the

6

District Court denied the motions to suppress. It concluded the Defendants did not have a reasonable expectation of privacy in their conversations with the confidential informants and, thus, the electronic monitoring of the conversations by use of body wire transmitting devices did not violate the Defendants' rights of privacy or to be free from unreasonable searches and seizures. The Defendants assert legal error.

¶13 The Fourth Amendment to the United States Constitution and Article II, Section 11 of the Montana Constitution protect citizens against unreasonable searches and seizures. The Defendants do not dispute that, pursuant to United States Supreme Court jurisprudence, warrantless electronic monitoring of face-to-face conversations, with the consent of one party to the conversation, does not constitute a search and, therefore, does not violate the Fourth Amendment. *See e.g. United States v. White*, 401 U.S. 745, 91 S. Ct. 1122 (1971). They assert, however, that Article II, Sections 10 and 11 of the Montana Constitution afford citizens a greater right to privacy which, in turn, provides broader protection than the Fourth Amendment in situations involving searches and seizures occurring in private settings.

¶14 Article II, Section 10 of the Montana Constitution provides that "[t]he right of individual privacy is essential to the well-being of a free society and shall not be infringed without the showing of a compelling state interest." Article II, Section 11 of the Montana Constitution provides that

> [t]he people shall be secure in their persons, papers, homes and effects from unreasonable searches and seizures. No warrant to search any place, or seize any person or thing shall issue without describing the place to be searched or the person or thing to be seized, or without probable cause, supported by oath or affirmation reduced to writing.

7

We address Article II, Section 10 in conjunction with Article II, Section 11 in analyzing and resolving a search or seizure issue that specifically implicates the right to privacy. *See e.g. Hardaway*, ¶ 32; *State v. Siegal*, 281 Mont. 250, 264-65, 934 P.2d 176, 184-85 (1997) (overruled in part in *State v. Kuneff*, 1998 MT 287, ¶ 19, 291 Mont. 474, ¶ 19, 970 P.2d 556, ¶ 19). Furthermore, "[i]n light of the constitutional right to privacy to which Montanans are entitled, we have held that the range of warrantless searches which may be lawfully conducted under the Montana Constitution is narrower than the corresponding range of searches that may be lawfully conducted pursuant to the federal Fourth Amendment." *Hardaway*, ¶ 35.

### I. *Solis* and *Brown*

¶15 Given the parties' and the District Court's understandable reliance in this case on early Montana privacy and search and seizure jurisprudence as set forth in *Solis* and *Brown*, we begin with a discussion of those cases. In *Solis*, law enforcement employed an undercover officer to act as a pawnshop proprietor and, with the officer's consent, videotaped certain events in the pawnshop. On numerous occasions, Solis was videotaped selling merchandise—some of which apparently was stolen—to the undercover officer. The State charged Solis with theft and intended to rely at trial on the videotapes and testimony from the officers running the taping machine rather than any testimony from the undercover officer who consented to the videotaping. *Solis*, 214 Mont. at 312-13, 693 P.2d at 519.

¶16 On appeal from the trial court's suppression of the videotapes and testimony, we addressed whether the State violated Solis's right to privacy under Article II, Section 10 of the Montana Constitution. First, we set forth the test for determining whether an individual has a constitutionally protected right of privacy as (1) does the individual have an actual or subjective expectation of privacy? and, if so, (2) is that expectation of privacy one which society is willing to view as reasonable? *Solis*, 214 Mont. at 314, 693 P.2d at 520 (citing *Missoulian v. Board of Regents of Higher Educ.*, 207 Mont. 513, 522, 675 P.2d 962, 967 (1984)). We concluded the defendant exhibited an actual expectation of privacy by holding his conversations with the undercover officer in a small, enclosed office within the pawnshop with only a personal friend of the defendant present, and this expectation of privacy was reasonable because there were no areas from which other individuals could have overheard the conversations. *Solis*, 214 Mont. at 314, 693 P.2d at 520. On the privacy versus electronic monitoring issue, we held that "in face-to-face encounters in a private setting, there is a reasonable expectation that hidden monitoring is not taking place." *Solis*, 214 Mont. at 318, 693 P.2d at 522.

¶17 We next proceeded to the question of whether a compelling state interest justified infringing on Solis's right under Article II, Section 10 of the Montana Constitution. We determined that a compelling state interest exists where the state is enforcing its criminal laws for the benefit and protection of its citizens, especially under the *Solis* circumstances where the suspect had engaged in repeated activity thought to be criminal. Even when a compelling interest in invading an individual's privacy existed, however, we required that the procedural safeguards attached to the constitutional right to be free from unreasonable

9

searches and seizures must first be met. In other words, "[t]he State was required to show probable cause to support the issuance of a search warrant." *Solis*, 214 Mont. at 318-19, 693 P.2d at 522. The trial court having found no exigent circumstances precluding law enforcement from a reasonable opportunity to seek a search warrant, we held that the warrantless monitoring and recording of the defendant's conversations with the undercover officer violated his right to be free from unreasonable searches. *Solis*, 214 Mont. at 319-20, 693 P.2d at 523.

¶18 *Solis* set forth an in-depth discussion and analysis of the right to privacy guaranteed by the Montana Constitution. However, only two Justices concurred in the holding based on application of the Montana Constitution. Three additional Justices concurred in the result of the decision, but relied on *Katz v. United States*, 389 U.S. 347, 88 S. Ct. 507 (1967), and other federal case law to determine that an unreasonable warrantless search occurred which was not justified by any exception to the warrant requirement. *Solis*, 214 Mont. at 320, 693 P.2d at 523 (Sheehy & Weber, JJ., & Haswell, C.J., concurring). Consequently, *Solis* is not controlling precedent regarding application of Article II, Sections 10 and 11 of the Montana Constitution to the substantially similar circumstances of the present case.

¶19 The Court decided *Brown* in 1988, less than four years after *Solis*. In that case, law enforcement monitored and recorded three conversations between a suspect and an undercover police officer via a body wire transmitting device attached to the officer. The conversations took place in a vehicle in a parking lot, over the telephone and in a motel room rented by the undercover officer, and all related to arranging and completing a

single transaction for the sale of marijuana. Upon being charged with felony criminal sale of dangerous drugs, the defendant moved to dismiss the charge, arguing in part that the recording of her conversations without her knowledge was illegal. The trial court denied the motion to dismiss and the defendant appealed. *Brown*, 232 Mont. at 3-4, 755 P.2d at 1366.

¶20 In addressing the defendant's face-to-face conversations in the vehicle and motel room, the Court noted the United States Supreme Court's holding in *White* that warrantless electronic monitoring of face-to-face conversations—with the consent of one participant—does not violate the search and seizure provisions of the Fourth Amendment to the United States Constitution. The Court also recognized, however, that Article II, Section 10 of the Montana Constitution, in conjunction with Article II, Section 11, grants rights beyond those in the federal constitution and requires an independent analysis of privacy and search and seizure issues. *Brown*, 232 Mont. at 9-10, 755 P.2d at 1369-70.

¶21 The *Brown* Court observed that some violation of a person's reasonable expectation of privacy must have occurred before the protections of Article II, Section 11 are implicated. The Court then determined—with little analysis and no citation to authority—that, while the defendant possessed a subjective expectation that her conversations with the undercover officer would remain private, her expectation of privacy was not reasonably justifiable and, consequently, no search or seizure occurred. *Brown*, 232 Mont. at 10, 755 P.2d at 1370. The Court further determined that the warrantless electronic monitoring and recording of a conversation with the consent of one participant did not violate Article II, Section 10 of the Montana Constitution. *Brown*, 232

11

Mont. at 11, 755 P.2d at 1371.  On that basis, the Court held that "warrantless consensual electronic monitoring of face-to-face conversations by the use of a body wire transmitting device, performed by law enforcement officers while pursuing their official duties, does not violate the right to be free of unreasonable searches and seizures nor the privacy section of the Montana Constitution."  *Brown*, 232 Mont. at 8, 755 P.2d at 1369.  The Court's prior holding in *Solis* was neither acknowledged nor overruled.

¶22    When discussing why the warrantless consensual electronic monitoring and recording of the conversation did not violate the defendant's rights under the Montana Constitution in *Brown*, the Court cited United States Supreme Court cases and one legal commentator.  Furthermore, while *Brown* did not expressly cite *White*, the concepts contained in the discussion of the Montana Constitution in *Brown* appear to be taken directly from the Supreme Court's rationale in that case.  *See White*, 401 U.S. at 749-54, 91 S. Ct. at 1125-27; *Brown*, 232 Mont. at 10-11, 755 P.2d at 1370-71.  Thus, notwithstanding our recognition in *Brown* that Article II, Sections 10 and 11 of the Montana Constitution, taken together, grant rights beyond those contained in the federal constitution, our resolution of that case merely paralleled federal jurisprudence on the subject and failed to properly analyze the greater rights guaranteed by Montana's Constitution.  Stated differently, having stated without equivocation that the Montana Constitution expressly provides more privacy protection than that inferred from the United States Constitution—with the corresponding obligation to provide an independent analysis under the Montana Constitution—we failed to follow through.  *See Brown*, 232 Mont. at 10-11, 755 P.2d at 1370-71.  Nor did we do so in the only two cases since 1988

12

in which we have cited *Brown* for its holding regarding the monitoring and recording of face-to-face conversations. *See State v. Belgarde*, 244 Mont. 500, 798 P.2d 539 (1990) and *State v. Staat*, 251 Mont. 1, 822 P.2d 643 (1991).

¶23 In more recent years, this Court has readily applied Article II, Section 10 in search and seizure cases to protect the privacy interests of Montana citizens. Indeed, in *Hardaway*, ¶ 57, we noted our "consistent trend toward protecting the privacy interests of our citizens[:]"

> [I]n *State v. Sawyer* [174 Mont. 512, 571 P.2d 1131 (1977)], this Court first applied Article II, Section 10 to a search and seizure case and explicitly stated that Section 10 provided greater individual privacy protection in such cases than did the federal constitution. We restated this rule in [*Solis*] and *State v. Sierra*, [214 Mont. 472, 692 P.2d 1273 (1985)], among others. During this same time, however, the Court ruled on numerous other search and seizure cases and made no reference to Article II, Section 10 whatsoever. . . . Subsequently, from the mid-1980s through the early 1990s, the Court provided no greater protection for individual privacy in search and seizure cases than parallel federal law provided . . . . However, since *City of Billings v. Whalen* (1990), 242 Mont. 293, 790 P.2d 471, this Court has given increased protection to the privacy rights of Montana citizens, limiting the scope of search and seizure cases, and since *State v. Bullock* [272 Mont. 361, 901 P.2d 61 (1995)], the Court has applied Article II, Section 10, emphasizing "privacy as a mechanism to support interpretation of search and seizure cases." . . . In the ensuing years, we consistently analyzed search and seizure cases involving significant privacy issues under both Sections 10 and 11 of Article II of the Montana Constitution.

*Hardaway*, ¶ 51. In light of this "consistent trend" of protecting Montana citizens' heightened privacy rights under our Constitution, the *Hardaway* Court overruled an earlier case addressing the relevant issue on the basis that the rationale in the prior case was premised exclusively on federal jurisprudence and failed to comport with current

13

search and seizure and right to privacy analyses under the Montana Constitution. *Hardaway*, ¶¶ 55-57 (overruling *State v. Ulrich*, 187 Mont. 347, 609 P.2d 1218 (1980)).

¶24 Similarly here, we conclude *Brown* provides little, if any, guidance in resolving the issue before us in light of the reliance on federal jurisprudence—and limited analysis and application of the provisions of the Montana Constitution—in that case. Therefore, we overrule *Brown* and again recognize that *Solis* is not controlling precedent. As a result, we examine the issue before us anew, applying more current and consistent interpretations of Article II, Sections 10 and 11 of the Montana Constitution.

## II. Analysis Under Current Montana Constitutional Search and Seizure and Right To Privacy Jurisprudence

¶25 The issue in the present case is whether the warrantless electronic monitoring and recording of a face-to-face conversation with the consent of one participant in the conversation violates the other participant's rights to privacy and to be free from unreasonable searches and seizures guaranteed by Article II, Sections 10 and 11. The initial inquiry in addressing this issue is determining whether such conduct constitutes a search. *See State v. Scheetz*, 286 Mont. 41, 46, 950 P.2d 722, 724 (1997). A search is "the use of some means of gathering evidence which infringes upon a person's reasonable expectation of privacy." *Hardaway*, ¶ 16. "A search occurs when the government infringes upon an individual's expectation of privacy that society considers objectively reasonable." Where no objectively reasonable expectation of privacy exists, a "search" does not occur within the contemplation of Article II, Section 11 of the Montana

14

Constitution. *State v. Hamilton*, 2003 MT 71, ¶ 17, 314 Mont. 507, ¶ 17, 67 P.3d 871, ¶ 17 (citing *Scheetz*, 286 Mont. at 46, 950 P.2d at 725).

¶26 Article II, Section 11 protects Montana citizens from *unreasonable* searches and seizures. Similarly, the Article II, Section 10 right to privacy—even where established—is not absolute, but may be infringed upon a showing of a compelling state interest to do so. *See State v. Nelson*, 283 Mont. 231, 243, 941 P.2d 441, 449 (1997). However, even upon a showing of a compelling state interest, "the State may not invade an individual's privacy unless the procedural safeguards attached to the right to be free from unreasonable searches and seizures are met." *State v. Elison*, 2000 MT 288, ¶53, 302 Mont. 228, ¶ 53, 14 P.3d 456, ¶ 53.

¶27 We determine whether a state action constitutes an "unreasonable" or "unlawful" search or seizure in violation of the Montana Constitution by analyzing three factors: 1) whether the person challenging the state's action has an actual subjective expectation of privacy; 2) whether society is willing to recognize that subjective expectation as objectively reasonable; and 3) the nature of the state's intrusion. *See e.g. State v. Hill*, 2004 MT 184, ¶ 24, 322 Mont. 165, ¶ 24, 94 P.3d 752, ¶ 24. The first two factors are considered in determining whether a search or seizure occurred, thus triggering the protections of Article II, Sections 10 and 11. The third factor relates to the reasonableness of the search or seizure under the circumstances. Under the third factor, we determine whether the state action complained of violated the Article II, Section 10 and 11 protections because it was not justified by a compelling state interest or was undertaken without procedural safeguards such as a properly issued search warrant or

other special circumstances. *See e.g. State v. Tackitt*, 2003 MT 81, ¶ 23, 315 Mont. 59, ¶ 23, 67 P.3d 295, ¶ 23; *Scheetz*, 286 Mont. at 50, 950 P.2d at 727; *State v. Smith*, 2004 MT 234, ¶¶ 12-13, 322 Mont. 466, ¶¶ 12-13, 97 P.3d 567, ¶¶ 12-13.  We address these factors in turn.

**A.  Did the Defendants Have an Actual Subjective Expectation of Privacy?**

¶28    "[W]e recognize that naturally a person seeks to protect certain parts of his or her privacy, and it is those desires which are at the foundation for the constitutional safeguards that exist to protect them."  *Scheetz*, 286 Mont. at 48, 950 P.2d at 726.  Moreover, a person normally expects privacy free from governmental intrusion not authorized by a warrant in her or his home.  *See State v. Graham*, 2004 MT 385, ¶ 21, 325 Mont. 110, ¶ 21, 103 P.3d 1073, ¶ 21 (citations omitted).  Thus, while the home is traditionally "the *raison d'être* for the constitutional protection[,]" "the right to be free from unreasonable searches and seizures encompasses more than the home . . . ."  *Graham*, ¶ 22.  In that regard, we observe again that Article II, Section 11 guarantees that "[t]he people shall be secure in their *persons, papers, homes and effects* from unreasonable searches and seizures."  (Emphasis added).

¶29    These fundamental principles clarify that we base our recognition of an actual expectation of privacy on various factors.  *See Scheetz*, 286 Mont. at 48, 950 P.2d at 726.  "'What a person knowingly exposes to the public is not protected, but what an individual seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected.'"  *Scheetz*, 286 Mont. at 49, 950 P.2d at 726-27 (quoting *Bullock*, 272 Mont. at 375, 901 P.2d at 70).  Indeed, in Montana,

when persons leave the privacy of their home and expose themselves and their effects to the public and its independent powers of perception, it is clear that they cannot expect to preserve the same degree of privacy for themselves or their affairs as they could expect at home. However, when a person takes precautions to place items behind or underneath seats, in trunks or glove boxes, or uses other methods of ensuring that those items may not be accessed and viewed without permission, there is no obvious reason to believe that any privacy interest with regard to those items has been surrendered simply because those items happen to be in an automobile.

*Elison*, ¶ 51 (citation omitted). While *Elison* involved physical items stowed within a vehicle, the same rationale applies to a conversation with another person in a vehicle which cannot be overheard by the public outside the vehicle. Thus, where a person has gone to considerable trouble to keep activities and property away from prying eyes, the person evinces a subjective expectation of privacy in those activities and that property. *State v. 1993 Chevrolet Pickup*, 2005 MT 180, ¶ 12, 328 Mont. 10, ¶ 12, 116 P.3d 800, ¶ 12. Accordingly, we determine whether a person has knowingly exposed something to the public and, consequently, surrendered his or her privacy protections by looking at the particular facts of the case. *Scheetz*, 286 Mont. at 49, 950 P.2d at 726-27.

¶30 Here, the face-to-face conversations between the Defendants and one other individual were within the Defendants' private homes and, in Hamper's case, in the confines of a vehicle. The Defendants did not conduct their conversations where other individuals were present or physically within range to overhear the conversations. In other words, the Defendants kept their activities and conversations away from prying eyes (and ears), and did not expose their conversations to the public's "independent

17

powers of perception." We conclude the Defendants exhibited actual subjective expectations of privacy in the face-to-face conversations they held in private settings.

### B. Is Society Willing to Recognize the Defendants' Expectations of Privacy as Reasonable?

¶31 We next address whether society is willing to recognize an individual's subjective expectation that a one-on-one conversation conducted in a private setting is not being surreptitiously electronically monitored and recorded. Stated differently, does society perceive it is reasonable to expect privacy in a personal conversation held in a private setting? "The reasonableness inquiry hinges on the essence of underlying constitutional values—including respect for *both* private, subjective expectations and public norms. In assessing the constitutionality of technologically enhanced government surveillance in a particular case, we must identify the values that are at risk, and vest the reasonable-expectation-of-privacy test with those values." *State v. Blow*, 602 A.2d 552, 555 (Vt. 1991).

¶32 We observe here the importance of avoiding an overly narrow delineation of the nature of the reasonableness inquiry, because to do so would render every conceivable factual difference in a conversation subject to litigation. In Montana, the protections afforded by Article II, Section 11 of the Montana Constitution "extend to all of Montana's citizens including those suspected of a criminal act or charged with one." *Hardaway*, ¶ 14. Indeed, we have long observed this principle, even under the search and seizure provision of our 1889 Constitution:

> the exercise of the power of search and seizure is absolutely essential to the public welfare. . . . But the process may be exercised, and the law enforced

18

and vindicated, without transgressing *those constitutional guaranties which are provided for all alike, the guiltless and the guilty*.

*State ex rel. Thibodeau v. Fourth Jud. Dist.*, 70 Mont. 202, 209, 224 P. 866, 869 (1924) (emphasis added).

¶33 We have on prior occasions quoted extensively from—and discussed the debates of—the delegates to the constitutional convention with regard to the inclusion of the right to privacy in the 1972 Montana Constitution. *See e.g. Siegal*, 281 Mont. at 276-77, 934 P.2d at 191-92. Delegate Campbell stated that "the [Bill of Rights] committee felt very strongly that the people of Montana should be protected as much as possible against eavesdropping, electronic surveillance, and such type of activities. . . . [W]e found that the citizens of Montana were very suspicious of such type of activity." Montana Constitutional Convention, Verbatim Transcript, March 7, 1972, p. 1682. Delegate Dahood reported even more strongly: "[I]t is inconceivable to any of us that there would ever exist a situation in the State of Montana where electronic surveillance could be justified. . . . [W]ithin the area of the State of Montana, we cannot conceive of a situation where we could ever permit electronic surveillance." *Transcript*, p. 1687. Thus, the Constitutional Convention delegates were aware of the great value Montana citizens place on the right to privacy and the clear risk to that privacy engendered by the existence and advancement of electronic technology as used by law enforcement.

¶34 "[T]he proceedings of the 1972 Montana Constitutional Convention disclose on the part of the delegates a particular concern over the intrusion of the government into the

19

privacy of Montanans through the use of various types of electronic monitoring and surveillance." *Siegal*, 281 Mont. at 265, 934 P.2d at 184.

> [I]t is clear that the delegates' concerns encompassed the invasion of citizens' privacy without their knowledge by means of various sorts of electronic audio and visual monitoring and surveillance equipment. Not only were the delegates wary of existing technology of this type, but they recognized that this sort of technology would continue to be refined and would become more widespread and easily available. In this regard their concerns have been well-founded. Moreover, it is also clear that, in the delegates' view, the use of this sort of technology should be justified only in the most serious of situations, involving heinous crimes where it is necessary to "risk the right of individual privacy because there is a greater purpose to be served."

*Siegal*, 281 Mont. at 277, 934 P.2d at 192.

¶35 The express statements of the delegates to the 1972 Montana Constitutional Convention regarding the government's use of electronic surveillance against Montana's citizens provide direct support for a conclusion that society is willing to recognize as reasonable the expectation that conversations held in a private setting are not surreptitiously being electronically monitored and recorded by government agents. We are convinced that Montanans continue to cherish the privacy guaranteed them by Montana's Constitution. Thus, while we recognize that Montanans are willing to risk that a person with whom they are conversing in their home or other private setting may repeat that conversation to a third person, we are firmly persuaded that they are unwilling to accept as reasonable that the same conversation is being electronically monitored and recorded by government agents without their knowledge.

¶36     Nor should the underlying purpose or content of the conversations at issue reflect upon society's willingness to accept a subjective expectation of privacy in those conversations as reasonable.  As the Supreme Court of Alaska aptly stated,

> [a]ll of us discuss topics and use expressions with one person that we would not undertake with another and that we would never broadcast to a crowd.  Few of us would ever speak freely if we knew that all our words were being captured by machines for later release before an unknown and potentially hostile audience.  No one talks to a recorder as he talks to a person. . . . One takes the risk that his friend may repeat what has been said.  One shouldn't be required to take the additional risk of an entirely different character—that his conversation is being surreptitiously transcribed or broadcast.
>
>                              .   .   .
>
> . . . . It is axiomatic that police conduct may not be justified on the basis of the fruits obtained.  It is, of course, easy to say that one engaged in an illegal activity has no right to complain if his conversations are broadcast or recorded.  If, however, law enforcement officials may lawfully cause participants secretly to record and transcribe private conversations, nothing prevents monitoring of those persons not engaged in illegal activity, who have incurred displeasure, have not conformed or have espoused unpopular causes.

*State v. Glass*, 583 P.2d 872, 877-78 (Alaska 1978) (internal citations omitted).

¶37     Based on the foregoing, we conclude each Defendant's expectation of privacy in the conversations at issue here is one society is willing to accept as reasonable.  As stated above, "[a] search occurs when the government infringes upon an individual's expectation of privacy that society considers objectively reasonable."  *Hamilton*, ¶ 17. Thus, we further conclude that the electronic monitoring and recording of the Defendants' in-person conversations constituted searches within the contemplation of the Article II, Sections 10 and 11 rights to privacy and to be free from unreasonable searches.

### C.  Nature of the State's Intrusion

21

¶38 We next address whether the nature of the State's intrusion in conducting the searches at issue renders those searches unreasonable under the circumstances before us. In other words, the remaining question is whether the searches violate the Defendants' rights under Article II, Sections 10 and 11 of the Montana Constitution.

¶39 As stated above, the Article II, Section 10 right to privacy is not absolute, but may be infringed upon a showing of a compelling state interest to do so. Even upon the showing of a compelling state interest, however, state action which infringes upon an individual's privacy right must be closely tailored to effectuate that compelling interest. *Hamilton*, ¶ 37. Thus, "the State may not invade an individual's privacy unless the procedural safeguards attached to the right to be free from unreasonable searches and seizures are met." *Elison*, ¶ 53.

¶40 Our long-standing rule is that searches conducted in the absence of a properly issued search warrant are *per se* unreasonable, absent a recognized exception to the warrant requirement. *See e.g. State v. McLees*, 2000 MT 6, ¶¶ 10 and 26, 298 Mont. 15, ¶¶ 10 and 26, 994 P.2d 683, ¶¶ 10 and 26.

> "The presence of a search warrant serves a high function. Absent some grave emergency, the Fourth Amendment [and Article II, Section 11 of the Montana Constitution] has interposed a magistrate between the citizen and the police. This was done not to shield criminals nor to make the home a safe haven for illegal activities. It was done so that an objective mind might weigh the need to invade that privacy in order to enforce the law. The right of privacy was deemed too precious to entrust to the discretion of those whose job is the detection of crime and the arrest of criminals."

*McLees*, ¶ 26 (quoting *State v. Sorenson*, 180 Mont. 269, 274, 590 P.2d 136, 140 (1979)).

Where, as here, a warrantless search has been conducted, the State bears the burden of

establishing that an exception to the warrant requirement justifies the search. *See Sorenson*, 180 Mont. at 273, 590 P.2d at 139. The State advances alternative arguments in this regard and we address them in turn.

## 1. Consent

¶41 The State first argues that the warrantless searches at issue here were authorized by the confidential informants' consent to the monitoring and recording of the conversations. Indeed, we long have recognized that a warrantless search is not unlawful where it is conducted with consent freely and voluntarily given. *See e.g. Sorenson*, 180 Mont. at 275, 590 P.2d at 140. Furthermore,

> "when the prosecution seeks to justify a warrantless search by proof of a voluntary consent, it is not limited to proof that consent was given by the defendant, but may show that permission to search was obtained from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected."

*Sorenson*, 180 Mont. at 275, 590 P.2d at 140 (quoting *United States v. Matlock*, 415 U.S. 164, 171, 94 S. Ct. 988, 993 (1974)). The State asserts that, because the confidential informants in these cases arranged with law enforcement to wear the body wires and clearly consented to the electronic monitoring and recording of the conversations, their consents justified the warrantless searches.

¶42 As noted above, we derived the third-party consent exception to the constitutional search warrant requirement in *Sorenson* from the United States Supreme Court's decision in *Matlock*. While we interpret Montana's Constitution to provide greater protections for individuals in the context of search and seizure issues than does the Fourth Amendment to the United States Constitution, we use some federal Fourth Amendment analysis in

addressing issues under the Montana Constitution. *See e.g. Scheetz*, 286 Mont. at 46-49, 950 P.2d at 725-27; *Hill*, ¶ 32. In that regard, we observe that the Supreme Court recently refined the third-party consent exception in *Georgia v. Randolph*, 547 U.S. 103, 126 S. Ct. 1515 (2006).

¶43 In *Randolph*, the defendant's wife contacted law enforcement regarding a domestic dispute she had with Randolph. The wife informed the officers upon their arrival that Randolph was a drug user and items of drug use were located in the house. Randolph, who was present in the house at the time, denied his wife's allegations and unequivocally refused the officers' request for his consent to search the house. The officers then obtained the wife's consent to search. During the search, the officers observed and seized evidence of drug use. Upon being charged with possession of cocaine, Randolph moved to suppress the evidence on the basis that his wife's consent, given over his express refusal to consent, rendered the searches unlawful. The trial court denied the motion, the Court of Appeals of Georgia reversed the trial court, and the Georgia Supreme Court affirmed. *Randolph*, 547 U.S. at 107-08 126 S. Ct. at 1519.

¶44 The United States Supreme Court granted certiorari to address the question of "whether one occupant may give law enforcement effective consent to search shared premises, as against a co-tenant who is present and states a refusal to permit the search." *Randolph*, 547 U.S. at 108, 126 S. Ct. at 1520. The Supreme Court first reiterated its *Matlock* statement that "'the consent of one who possesses common authority over premises or effects is valid as against the *absent*, nonconsenting person with whom that authority is shared.'" *Randolph*, 547 U.S. at 110, 126 S. Ct. at 1521 (quoting *Matlock*,

24

415 U.S. at 170, 94 S. Ct. at 993) (emphasis added). After some discussion of the underlying principles of co-tenancy, mutual authority over property or effects, and the Fourth Amendment's protection of the individual against intrusion by the government, the Supreme Court held that "a warrantless search of a shared dwelling for evidence over the express refusal of consent by a physically present resident cannot be justified as reasonable as to him on the basis of consent given to the police by another resident." *Randolph*, 547 U.S. at 120, 126 S. Ct. at 1526.

¶45    The Supreme Court further clarified that

> if a potential defendant with self-interest in objecting is in fact at the door and objects, the co-tenant's permission does not suffice for a reasonable search, whereas the potential objector, nearby but not invited to take part in the threshold colloquy, loses out. . . . So long as there is no evidence that the police have removed the potentially objecting tenant from the entrance for the sake of avoiding a possible objection, there is practical value in the simple clarity of complementary rules, one recognizing the co-tenant's permission when there is no fellow occupant on hand, the other according dispositive weight to the fellow occupant's contrary indication when he expresses it.

*Randolph*, 547 U.S. at 121-22, 126 S. Ct. at 1527.

Here, the search of conversations by means of electronic monitoring and recording, rather than the search of premises, is at issue. Each party to each conversation was physically present at the time of the search and had an interest—that is, an interest in the nature of a co-tenant in physical premises—in the conversation. Under the *Randolph* rationale—which we expressly adopt vis-à-vis private face-to-face conversations—the confidential informants' consent to the electronic monitoring and recording of the conversations could not override any objection expressed by the Defendants.

25

Furthermore, because both parties to the conversations were present at the time the searches were conducted, both parties must have the opportunity to object to the search. As the Supreme Court observed, law enforcement may not avoid a refusal of consent by removing a potentially objecting individual from the premises prior to requesting consent. "A generalized interest in expedient law enforcement cannot, without more, justify a warrantless search." *Randolph*, 547 U.S. at 115, 126 S. Ct. at 1524, n. 5.

¶46    Similarly, here, the State cannot justify a search under the consent exception as a result of the simple expedient of failing to inform the potential—and physically present—objecting party that the search is being conducted.  We conclude that the warrantless searches of the conversations at issue here cannot be justified by the consent exception to the warrant requirement.

## 2.  Particularized Suspicion Standard

¶47    Alternatively, the State contends that, if we conclude the electronic monitoring and recording of a face-to-face conversation constitutes a search, it should be subject to a particularized suspicion standard rather than the Article II, Section 11 probable cause requirement for the issuance of a search warrant.  In essence, the argument is that the State's intrusion into the Defendants' privacy expectations by the electronic monitoring and recording of their conversations was minimal and, therefore, did not rise to a level of requiring probable cause.

¶48    We observe at the outset that the State relies on *1993 Chevrolet Pickup* and *State v. Hart*, 2004 MT 51, 320 Mont. 154, 85 P.3d 1275, in support of applying a particularized suspicion standard to justify the searches of the conversations in the

26

present cases. Neither of the cited cases—one of which involved the search of garbage placed in an alley and the other a canine sniff of the exterior of a vehicle—remotely supports applying a particularized suspicion standard to justify a search occurring in an individual's home. "In *Bullock* and *Siegal*, we validated the long-standing notion throughout this country, but especially in Montana, that a person's residence and his homestead are secure from unwarranted government intrusion, be it by physical or technological means." *Scheetz*, 286 Mont. at 48, 950 P.2d at 726. In two of the searches at issue here, the State intruded into the sanctity of the Defendants' homes for the purpose of performing those searches by technological means. We will not countenance such an intrusion under a lesser standard than probable cause.

¶49 We turn, then, to the State's argument that the particularized suspicion standard should apply to the search of the conversation between Hamper and the confidential informant which took place in the confidential informant's vehicle. It first relies on *1993 Chevrolet Pickup* in support of its argument, but that case is readily distinguishable.

¶50 In *1993 Chevrolet Pickup*, law enforcement believed a suspect was operating an illegal drug laboratory. After a several-month investigation of the suspect's activities, law enforcement officers conducted a warrantless "trash dive" on garbage cans located in the alley behind the suspect's residence and discovered items related to the manufacture of methamphetamine. Based on the evidence found in the suspect's trash bags, the officers obtained a search warrant and the subsequent search of the suspect's residence, pickup truck and boat turned up additional drug-related evidence. The suspect moved to suppress the evidence found during the warrant search, arguing the warrant was invalid

because it was based on evidence obtained from an illegal search of his garbage. The trial court denied the motion, determining that the suspect did not have a reasonable expectation of privacy in his garbage. *1993 Chevrolet Pickup*, ¶¶ 3-4.

¶51 On appeal, we addressed whether the warrantless search of a person's garbage violated the person's rights under Article II, Sections 10 and 11 of the Montana Constitution. We determined that, where a person has abandoned his or her garbage by placing it at a curb or in an alley for collection, any continued expectation of privacy in the garbage is not one society is willing to accept as reasonable. Thus, law enforcement's actions of removing the garbage bag and looking through it for evidence constituted neither a seizure nor a search as contemplated by the Montana Constitution. *1993 Chevrolet Pickup*, ¶ 17. Notwithstanding the absence of a seizure or a search, we placed constraints on such law enforcement activities, including a requirement that law enforcement have particularized suspicion that a crime is being committed to justify looking through the garbage. *1993 Chevrolet Pickup*, ¶¶ 19-20. Having concluded above that the electronic monitoring and recording of Hamper's conversation with the confidential informant in the informant's vehicle constituted a search, we need not address *1993 Chevrolet Pickup* further.

¶52 The State also relies on *Hart* in support of its argument that a particularized suspicion standard should apply to justify the warrantless monitoring and recording of face-to-face conversations with the consent of one participant in the conversation. *Hart* involved a drug-detecting canine sniff of the exterior of a vehicle. We determined the dog sniff of the exterior of a vehicle constituted a search, but that such a search may be

justified by particularized suspicion of wrongdoing, rather than probable cause sufficient for issuance of a search warrant. *Hart*, ¶ 20 (citing *Tackitt*, ¶ 29). Here, the State asserts that, because the electronic monitoring and recording of a conversation is even less intrusive than a dog sniff, particularized suspicion is a sufficient standard here. We disagree.

¶53 In *Tackitt*, law enforcement officers used a drug-detecting canine to sniff the exterior of the defendant's vehicle parked outside his residence and the canine alerted on the trunk of the vehicle, indicating the presence of drugs. *Tackitt*, ¶ 7. We relied on *Elison*, ¶ 51, in concluding that the canine sniff constituted a search because Tackitt maintained a reasonable expectation of privacy in the items stowed in his vehicle's trunk. *Tackitt*, ¶¶ 21-22. We then determined that, although warrantless searches generally are *per se* unreasonable, the purpose and minimally intrusive nature of such a canine sniff warranted an exception to the warrant requirement, but would "still require particularized suspicion when the area or object subject to the canine sniff is already exposed to the public." *Tackitt*, ¶ 29. Here, however, the private face-to-face conversation in the vehicle was not exposed to the public. Consequently, we decline to adopt a particularized suspicion standard to justify the warrantless electronic monitoring and recording of a one-on-one conversation occurring in a vehicle.

### III. Conclusion

¶54 For the above-stated reasons, we hold that the electronic monitoring and recording of the Defendants' conversations with the confidential informants, notwithstanding the consent of the confidential informants, constituted searches subject to the warrant

29

requirement of Article II, Section 11 of the Montana Constitution. The electronic monitoring and recording of those conversations without a warrant or the existence of an established exception to the warrant requirement violated the Defendants' rights under Article II, Sections 10 and 11. As a result, we hold the District Court erred in denying the Defendants' motions to suppress evidence derived from the warrantless electronic monitoring and recording of the three conversations at issue on the basis that the activities at issue did not constitute searches.

¶55 Reversed and remanded for further proceedings consistent with this opinion.


/S/ KARLA M. GRAY


We concur:

/S/ JAMES C. NELSON
/S/ PATRICIA COTTER


Justice W. William Leaphart, specially concurring.

¶56 I specially concur in the court's conclusion that evidence obtained through warrantless, consensual participant recording of a conversation in a home or automobile is not admissible in court. Although the court ties its rationale to the private settings (home and automobile) involved in these cases, I would not limit a Montana citizen's reasonable expectation of conversational privacy to "private settings."

¶57 In my view, Montanans do not have to anticipate that a conversation, no matter what the setting, is being secretly recorded by agents of the state acting without benefit of a search warrant. As Justice Harlan noted in his dissent in *United States v. White*, 401 U.S. 745, 91 S. Ct. 1122 (1971), "it is one thing to subject the average citizen to the risk that participants in a conversation with him will subsequently divulge its contents to another, but quite a different matter to foist upon him the risk that unknown third parties may be simultaneously listening in." 401 U.S. at 777, 91 S. Ct. at 1138. This Court relied on this distinction in *State v. Brackman*, 178 Mont. 105, 115, 582 P.2d 1216, 1221 (1978), where we recognized that consensual participant monitoring of a conversation in a shopping center parking lot violated Brackman's expectations of privacy under the Montana Constitution. In *State v. Solis*, 214 Mont. 310, 693 P.2d 518 (1984), we specifically noted the concern with electronic eavesdropping expressed during the debates at the constitutional convention, *Solis*, 214 Mont. at 316-18, 693 P.2d at 521-22, and concluded that, in "face to face encounters in a private setting, there is a reasonable expectation that hidden monitoring is not taking place." *Solis*, 214 Mont. at 318, 693 P.2d at 522. *Brackman* was overruled in *State v. Brown*, 232 Mont. 1, 8, 755 P.2d 1364, 1369 (1988). Although the Court now breathes life back into our decisions in *Solis* and *Brackman* by overruling *Brown*, it does so in the limited context of "private settings," i.e., in a home or an automobile.

¶58 Article II, Section 11, like the Fourth Amendment, protects people not places. *State v. Bassett*, 1999 MT 109, ¶ 36, 294 Mont. 327, ¶ 36, 982 P.2d 410, ¶ 36 (citing *Katz v. United States*, 389 U.S. 347, 351, 88 S. Ct. 507, 511). This focus on the person rather

than the place or setting is even more compelling in the context of Article II, Section 10, which "is broader in the sense that it encompasses information and activities in addition to places and persons." *State v. Nelson*, 283 Mont. 231, 243, 941 P.2d 441, 449 (1997). Article II, Section 10, provides that "[t]he right of individual privacy is essential to the well-being of a free society and shall not be infringed without the showing of a compelling state interest." Although an individual's expectation of privacy may be more compelling in one setting (e.g., a home) than another, that is not to say that an individual conversing in a more public setting has no expectation of privacy and must reasonably anticipate the risk of warrantless consensual monitoring. As Justice Harlan observed in *White*, warrantless consensual monitoring "undermine[s] that confidence and sense of security in dealing with one another that is characteristic of individual relationships between citizens in a free society." *White*, 491 U.S. at 787, 91 S. Ct. at 1143 (Harlan dissenting). A "free society" is precisely what Article 10, Section 10, was designed to foster. This constitutional guarantee ensures that our citizens may continue to engage in private discourse, free to speak with the uninhibited spontaneity that is characteristic of our democratic society. As is evident from the constitutional debates, warrantless monitoring has a chilling effect on citizen discourse and thereby undermines the "well-being of a free society." *See* Montana Constitutional Convention Verbatim Transcript Vol. V, pp. 1682-87; Mont. Const., art. X, § 10.

¶59  In my view, a society in which individuals conversing outside a private setting such as their home must anticipate the risk of state instigated, warrantless monitoring is not the "free society" envisioned by the framers of our Constitution.

¶60    Accordingly, I would resurrect our *Brackman* holding in its entirety and recognize an expectation of conversational privacy free from warrantless consensual monitoring, in any setting, including, but not limited to, a public parking lot.

¶61    I also note that Justice Rice's dissent castigates the Court for framing the issue too broadly given that "the facts here do not involve situations where police did not have particularized suspicion and probable cause." ¶ 88.  One wonders why, if the police had probable cause, they did not simply apply for a warrant, as the constitution requires. There is a theme throughout the dissent that someone who chooses to engage in discourse about criminal endeavors, has no expectation of privacy.[1]  The examples and rationales cited are all circuitous in that they assume the "risky" or illegal "nature" of the conversation in question.  An officer does not know that a call is obscene or that the conversation relates to a drug sale until after the officer listens in or hears the tape of the conversation.  If the officer does have prior reason to believe that an individual has already engaged in obscene calling or drug sales, then the officer has probable cause to obtain a warrant.  In the absence of probable cause, however, we should not let the ends

---

[1] Examples from the dissent: "without considering the nature and purpose [drug deal] of the conversation." ¶ 90; "A person simply cannot have the same expectation of privacy when he knowingly exposes illegal drugs for the commercial purpose of selling them to a non-confident as he does while engaged in private socializing with friends and family." ¶ 96; "because society would not consider a privacy interest in a non-private commercial drug transaction to be reasonable." ¶ 99; "The very idea that one engaged in the commercial sale of illegal drugs to a non-confidant must be given the 'opportunity to object' before police can monitor the parties' conversation is a flight into the fanciful, perhaps the ludicrous." ¶ 104 n.2; "There is not only no indication that the Declaration of Rights was intended to be applied to such risky, non-private behavior, but the debates demonstrate just the opposite." ¶ 114.

(the illegal nature of the call) justify the means (monitoring). This is tantamount to concluding that someone who allegedly engages in theft has no Fourth Amendment expectation of privacy and thus the police are free to search his house without a warrant.

¶62 The dissent endeavors to distinguish illegal commercial discourse from private socializing; suggesting that warrantless consensual monitoring will only be allowed in illegal commercial transactions. What if the transaction were not "commercial," that the defendant was delivering drugs free of charge. Would the dissent's constitutional analysis suddenly transform, cloaking the defendant with an expectation of privacy?

¶63 The dissent believes that the Court has strayed from the facts of this case and has stated the issues too broadly. The Court's societal approach is more than justified however when one looks at the breadth of the dissent's rationale. The dissent reasons that "a conversation, unlike a home, is not a shared space. Once the conversation commences, it becomes the individual property of each participant. . . . Neither participant can prevent the other (absent privilege) from sharing or repeating the conversation because each has full control over it." ¶ 101. Thus despite the dissent's protestations that those of us engaged in private conversations about legitimate matters need not be concerned, in fact under the dissent's reasoning, no one engaged in a conversation, wherever the setting, whatever the purpose, has an expectation of privacy since the other participant (with full control) can, consent to third-party monitoring or recording. The dissent reasons that a person conversing in a private setting for non commercial purposes, for example at a family Thanksgiving dinner, or even someone engaging in illegal activity (e.g., smoking pot at a friend's house) will have more of an

34

expectation of privacy than the defendants here. What the dissent fails to recognize is that, whatever the expectation of privacy is (be it heightened or diminished), it can always be undermined by monitoring through the consent of the other party to the conversation. In other words, consent of one party to a conversation will always trump the expectation of the other.

¶64　The dissent's reliance on our decision in *State v. Brown*, 232 Mont. 1, 755 P.2d 1364 (1988), and the United States Supreme Court's decision in *United States v. White*, 401 U.S. 745 (1971), illustrate this point; that is, irrespective of the setting, any expectation of privacy in a conversation dissolves in the face of consent by the other party.　The Supreme Court "has held that however strongly a defendant may trust an apparent colleague, his expectations in this respect are not protected by the Fourth Amendment when it turns out that the colleague is a government agent regularly communicating with the authorities."　The Fourth Amendment does not protect "a wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it."　*White*, 401 U.S. at 749 (quoting *Hoffa v. United States*, 385 U.S. 293 (1966)).

¶65　Justice Cotter suggests that Justice Rice's rationale would apply not just to illegal commercial transactions, but to *all commercial* transactions.　Although I agree, I think the dissent's rationale is even broader than Justice Cotter suggests.　It applies to *all conversations*, commercial or otherwise.　Under the dissent's reliance on *Brown*[2], as long

---

[2] "We now hold that warrantless consensual electronic monitoring of face-to-face conversations by the use of body wire transmitting device, performed by law enforcement

as one of the participants with "full control" consents, third-party recording or monitoring simply is not a search under the constitution. It matters not whether the monitoring occurs in the home or on main street USA. Law enforcement, without the necessity of showing probable cause or obtaining a warrant, can use this tool at their whim.

¶66 Justice Rice is of the opinion that a society in which individuals feel that they can speak freely with one another confident that the government cannot monitor the conversation without a warrant would result in anarchy. He argues that "freedom means the right to pursue one's own life within the confines of the solemn principles upon which the democracy was founded." ¶ 120. In my view, one of the most "solemn" of the principles upon which our democracy flourishes is the Fourth Amendment's warrant requirement which protects citizens from unreasonable intrusion by the state.

¶67 Anarchy is the absence of any political authority; the theory that all forms of government are oppressive and should be abolished. *American Heritage Dictionary 3rd Ed*. Justice Rice's characterization to the contrary, I am not advocating anarchy. Quite the opposite; I'm arguing that our constitutional form of government, the Fourth Amendment in particular, should be *enforced*-not abolished.

¶68 In this day and age of high-tech surveillance, warrantless monitoring of conversations between individuals does not bode well for a free and democratic society.

/S/ W. WILLIAM LEAPHART

---

officers while pursing their official duties, does not violate the right to be free of unreasonable searches and seizures nor the privacy section of the Montana Constitution." *Brown*, 232 Mont. at 8, 755 P.2d at 1369.

Justice James C. Nelson joins the special concurrence of Justice Leaphart.

/S/ JAMES C. NELSON

Justice Brian Morris concurs and dissents.

¶69    I concur with the Court's determination that Goetz and Hamper possessed a reasonable expectation of privacy in their conversations that took place in their own homes.  I part ways with the Court's conclusion, however, that Hamper similarly enjoyed a reasonable expectation of privacy in his conversation with White that took place inside White's vehicle.

¶70    *State v. Brown*, 232 Mont. 1, 755 P.2d 1364 (1988), plainly controls our decision on whether Hamper had a reasonable expectation of privacy in the conversation that took place in White's vehicle.  This Court held that Brown had no reasonable expectation of privacy in his conversation with an informant in "a vehicle parked in a bar parking lot." *Brown*, 232 Mont. at 3, 755 P.2d at 1366.  We likewise should conclude that Hamper had no reasonable expectation of privacy in his conversation with White in White's vehicle as there is no meaningful distinction between the facts at issue here and the facts at issue in *Brown*.

¶71    This Court discards *Brown*, along with our seemingly contradictory holding in *State v. Solis*, 214 Mont. 310, 320, 693 P.2d 518, 523 (1984), however, in light of their

37

reliance on federal jurisprudence and their limited analysis and application of the Montana Constitution. ¶ 24. The *Solis* court stated that "in face-to-face encounters in a private setting, there is a reasonable expectation that hidden monitoring is not taking place." *Solis*, 214 Mont. at 318, 693 P.2d at 522. The *Brown* court countered, without any attempt to distinguish *Solis*, that "there is no violation of Montana's right to privacy, or the prohibition against unreasonable searches and seizures, when law enforcement officers pursing [sic] their official duties perform warrantless consensual electronic monitoring of face-to-face conversations." *Brown*, 232 Mont. at 11, 755 P.2d at 1371. The Court now foregoes any attempt to reconcile the broad rule in *Brown* and the equally broad rule, but contradictory rule in *Solis*, in favor of what it deems to be "more current and consistent interpretations of Article II, Sections 10 and 11 of the Montana Constitution." ¶ 24.

¶72 The Court's discarding of *Brown* represents an unnecessary departure from the principle of stare decisis. We have held that precedent should be overruled only if it is manifestly wrong. *Beckman v. Butte-Silver Bow County*, 2000 MT 112, ¶ 20, 299 Mont. 389, ¶ 20, 1 P.3d 348, ¶ 20. This Court squarely has affirmed the analysis in *Brown* on several occasions, including *State v. Staat*, 251 Mont. 1, 7-8, 822 P.2d 643, 647 (1991), and *State v. Belgarde*, 244 Mont. 500, 504, 798 P.2d 539, 542 (1990). Nowhere in these decisions does the Court question the continuing vitality of *Brown's* analysis.

¶73 I cannot agree under these circumstances that the result in *Brown* is so manifestly wrong that it should be discarded entirely. The Court cites *State v. Hardaway*, 2001 MT

38

252, ¶ 51, 307 Mont. 139, ¶ 51, 36 P.3d 900, ¶ 51, to justify its discarding of *Brown* and *Solis*. ¶ 23. *Hardaway*, in turn, cites *Solis* with approval. *Hardaway*, ¶ 51.

¶74 For better, or worse, *Solis* and *Brown* provide our precedent on the very issue before the Court--whether warrantless electronic monitoring and recording of a party's one-on-one conversations with a confidential informant violates the party's reasonable expectation of privacy. Rather than discarding them to the rubbish heap, I would reconcile the holdings in *Solis* and *Brown* by limiting them to the facts that were before those courts. I would read *Solis* to hold that a person may have a reasonable expectation of privacy in a conversation that takes place in a "small, enclosed office" that ostensibly remains under the exclusive control of his confidant. *Solis*, 214 Mont. at 314, 693 P.2d at 520. Solis reasonably could have assumed that the pawnbroker had exclusive control over his own "small, enclosed office." By contrast, I would read *Brown* to hold that a person may not have a reasonable expectation of privacy in a conversation that takes place in a vehicle or motel that the person reasonably could not assume was under the exclusive control of his confidant. *Brown*, 232 Mont. at 3, 755 P.2d at 1366. Both the vehicle and the motel room at issue in *Brown* may have been subject to third-party ownership and a variety of different users, any of whom could subject a conversation to electronic monitoring.

¶75 I would conclude pursuant to our holding in *Solis* that Goetz and Hamper possessed reasonable expectations of privacy in the conversations with the informants that took place in their homes. Hamper and Goetz reasonably could have expected as much privacy in their own homes as Solis could have expected in the private office of his

confidant. *Solis*, 214 Mont. at 314, 693 P.2d at 520. I would conclude pursuant to our holding in *Brown*, however, that Hamper lacked a reasonable expectation of privacy in his conversation with White in White's vehicle, as both Hamper's and Brown's conversations took place under similar circumstances. White's vehicle--like Brown's-- was parked in a parking lot. *Brown*, 232 Mont. at 3, 755 P.2d at 1366. Furthermore, the record does not indicate whether Hamper reasonably could be sure that his confidant exclusively had control over the vehicle in which their conversation took place. In fact, the record indicates that Hamper did not know the informant, and presumably he would not know whether the informant owned or controlled the vehicle in which the conversation took place.

¶76    Other courts likewise have distinguished a warrantless search of a person's home from a warrantless search of a person's automobile. The Supreme Court of West Virginia recently held that warrantless consensual electronic monitoring of face-to-face conversations in a defendant's home represents an unconstitutional invasion of privacy. The court overruled its earlier conflicting decision on the basis that the court had "assumed, without discussion, that no difference existed between a person's reasonable expectations of privacy in his/her home, versus the privacy a person expects outside the home." *State v. Mullens*, 650 S.E.2d 169, 189 (W.Va. 2007). The court supported its assertion with its earlier statement in *State v. Peacher*, 280 S.E.2d 559, 578 (W.Va. 1981), that "'[a] person's expectation of privacy in his automobile is less than that which he would have in his home[.]'" *Mullens*, 650 S.E.2d at 189. The United States Supreme Court similarly has stated that "one's expectation of privacy in an automobile and of

freedom in its operation are significantly different from the traditional expectation of privacy and freedom in one's residence." *United States v. Martinez-Fuerte*, 428 U.S. 543, 561, 96 S. Ct. 3074, 3084-85 (1976).

¶77 For these reasons, I join the Court's opinion with respect to its decision that Hamper and Goetz possessed reasonable expectations of privacy in their conversations with the informants that took place in their homes. For these same reasons, I dissent from the Court's opinion with respect to its decision that Hamper enjoyed a reasonable expectation of privacy in his conversation with White that took place inside White's vehicle.

/S/ BRIAN MORRIS

Justice Jim Rice, dissenting.

¶78　It would be a dubious service to the genuine liberties protected by the Fourth Amendment to make them bedfellows with spurious liberties improvised by farfetched analogies which would liken eavesdropping on a conversation, with the connivance of one of the parties, to an unreasonable search or seizure.  We find no violation of the Fourth Amendment here.

*On Lee v. United States*, 343 U.S. 747, 754, 72 S. Ct. 967, 972 (1952).

¶79　The Court today makes the precise error with regard to the Montana Constitution's Declaration of Rights, which the United States Supreme Court warned against in deciding the same issue under the Bill of Rights of the United States Constitution.  The Court's error springs from an incorrect analytical approach to the issue, resulting in an unnecessarily broad and sweeping decision not predicated on the specific facts of this case.  Indeed, the inattentiveness to the facts leads the Court to overlook the critical point of the case, and the unfortunate result is the overruling of our long-standing precedent and the distortion of the right to privacy.

¶80　Today the Court overrules the state and federal precedent we have long followed and strongly re-endorsed, and upon which law enforcement in this state has relied for twenty years.  The Court justifies its decision to overturn this precedent by characterizing our resolution in *Solis* as non-controlling and our decision in *Brown* as "merely parallel[ing] federal jurisprudence . . . and fail[ing] to properly analyze the greater rights guaranteed by Montana's Constitution."  Opinion, ¶ 22.  I disagree with this assessment.

¶81　First, while I agree that *Solis* is not "controlling precedent," Opinion, ¶ 24, I submit that the fact-grounded reasoning of the plurality opinion in *Solis* is precisely the correct analysis to be employed, and that the *Solis* plurality reached the correct decision

42

under that fact-based approach. However, the Court determines that because *Solis* is not "controlling," it need not be considered at all. Opinion, ¶¶ 18, 24.

¶82 Second, the Court's contention that our decision in *Brown* failed to properly analyze the greater rights guaranteed by the Montana Constitution, Opinion, ¶ 22, is clearly without merit. In *Brown* we recognized that "Montana's Constitutional protections have an existence which is separate from the Federal Constitutional protections" and that it is necessary to "offer an independent analysis of the privacy and search and seizure provisions of the Montana Constitution." *Brown*, 232 Mont. at 9-10, 755 P.2d at 1370. Accordingly, we lengthened the analysis in *Brown* beyond the Fourth Amendment, stating that "[t]he analysis . . . must go further because the framers of the Montana Constitution specifically provided an additional protection with the right to privacy provision." *Brown*, 232 Mont. at 10, 755 P.2d at 1370. Thus, we did not, as the Court spins, ignore the heightened privacy protections of our Montana Constitution in *Brown*.

¶83 Critically, the *Brown* court concluded that, under the Montana Constitution, the facts demonstrated that the defendant's claim to an expectation of privacy was not one society would deem reasonable, and that the government's actions, which effectuated only "the recording of [Brown's] words," were not excessively intrusive. *Brown*, 232 Mont. at 11, 755 P.2d at 1371. Under the facts of that case, the Court approved the warrantless consensual electronic monitoring of a face-to-face conversation regarding a drug deal. However, the Court today ignores our holding in *Brown* and overrules that

43

case on the thin basis that *Brown* "merely paralleled federal jurisprudence on the subject . . . ." Opinion, ¶ 22.

¶84   It is true that *Brown* relied upon the United State Supreme Court case of *White*, a case which offered a very practical and common sense approach to the same issue we face today, and we should be wary of abandoning the well established and practical *White* decision by overruling *Brown* merely because *Brown* followed federal jurisprudence.  In *White* the High Court emphasized a twentieth century "doctrinal" Fourth Amendment analysis, explaining the absence of a privacy interest in a consensually recorded drug transaction with a stranger:

> Concededly a police agent who conceals his police connections may write down for official use his conversations with a defendant and testify concerning them, without a warrant authorizing his encounters with the defendant and without otherwise violating the latter's Fourth Amendment rights.  *Hoffa v. United States*, 385 U.S., at 300-03.  For constitutional purposes, no different result is required if the agent instead of immediately reporting and transcribing his conversations with defendant, either (1) simultaneously records them with electronic equipment which he is carrying on his person, *Lopez v. United States, supra*; (2) or carries radio equipment which simultaneously transmits the conversations either to recording equipment located elsewhere or to other agents monitoring the transmitting frequency.  *On Lee v. United States, supra*.  *If the conduct and revelations of an agent operating without electronic equipment do not invade the defendant's constitutionally justifiable expectations of privacy, neither does a simultaneous recording of the same conversations made by the agent or by others from transmissions received from the agent to whom the defendant is talking and whose trustworthiness the defendant necessarily risks*.

*White*, 401 U.S. at 751, 91 S. Ct. at 1125-26 (emphasis added).  The *Brown* court noted that, while *White* was a four justice plurality opinion, seventeen years had passed since the decision, the Supreme Court had since endorsed the holding in *U.S. v. Caceres*, 440

44

U.S. 741, 99 S. Ct. 1465 (1979), and it had since been applied in the federal circuits. *Brown*, 232 Mont. at 8-9, 755 P.2d at 1369-70. Thus, our Court adopted *White's* strong, practical reasoning and we should not discard it now.

¶85    Moreover, the Court ignores the fact that *Brown* has been specifically and repeatedly reaffirmed by this Court. In fact, in *Belgarde*, when we again entertained an argument that warrantless consensual monitoring violated the Montana Constitution's privacy provisions, we noted our decision in *Brown*, and then took the unusual step of holding—emphatically—that "[w]e *refuse* to reverse this rule." *Belgarde*, 244 Mont. at 504, 798 P.2d at 542 (emphasis added). The Court's departure from stare decisis here is demonstratively weak and unsupported. With one fell swoop, the Court today overturns a longstanding and strongly applied line of authority with little concern for the consequences.

¶86    Having overruled *Brown* and dismissed *Solis* entirely, the Court then flits to another analysis in order to "examine the issue before us anew, applying more current and consistent interpretations of Article II, Sections 10 and 11 of the Montana Constitution." Opinion, ¶ 24. This "analysis" is one which wholly disregards the facts, generalizes the issue on appeal, and renders broad, sweeping conclusions under the guise of "more current and consistent interpretations" of the Montana Constitution. I submit that there could be nothing more "current and consistent" than the interpretation we have repeatedly applied for the past twenty years.

¶87    After setting forth briefly the facts in the background section of the Opinion, ¶¶ 4-8, the Court barely mentions them again during the remainder of the Opinion. An

45

explanation for this detachment from the particulars may be that the Court, from the beginning, appears to have been thinking about broader or different issues than those actually raised here, as evidenced by the questions the Court asked the State during oral argument:

> Q. It's the State's contention that there's no need for particularized suspicion or probable cause. In fact, as I understand it, the State doesn't even believe that there is any necessity that the cops believe that a crime was, is, or is about to be committed. They can run somebody with a body wire into somebody's home at the cop's discretion.
>
> A. Because there is no search as this Court held in *Brown* –
>
> Q. Well, isn't that true?
>
> A. Well, I think, I think your – the question, with all respect, is phrased too broadly.
>
> Q. Well, why is it phrased too broadly? If, if this is completely discretionary with the cops, they can send someone with a body wire into someone's home to gather evidence. They can send somebody into a person's home just to snoop. They can send somebody into a home to gather information that might be used in a future prosecution or no prosecution at all. It's completely discretionary with the police. Correct?
>
> A. No.

State's counsel was correct. These questions were indeed phrased too broadly, demanding answers from counsel for scenarios not at issue.

¶88 The facts of this case do not involve the exercise of "complete discretion" by police to wire someone "just to snoop" or "to gather information that might be used" or not used at all. The facts here do not involve situations where police did not have particularized suspicion and probable cause. Even before wiring the informants, police had probable cause to believe that both defendants had already committed the crime of

criminal distribution of dangerous drugs. Authority to wire aside, the police could have *arrested* the defendants because they had already committed a crime.[1]

¶89 The facts are critical, and this case should be decided on its facts. As the Court recites, "whether a person has knowingly exposed something to the public and, consequently, surrendered his or her privacy protections [is determined] by looking at the particular facts of the case." Opinion, ¶ 29. *See State v. Dunn*, 2007 MT 296, ¶ 13, 340 Mont. 31, ¶ 13, 172 P.3d 110, ¶ 13 (explaining that when "ascertaining if a person has a legitimate expectation of privacy, we look to the circumstances . . . ."); *Scheetz*, 286 Mont. at 48, 950 P.2d at 726 (stating that we look to "various factors"); *State v. Siegal*, 281 Mont. 250, 273-74, 934 P.2d 176, 190 (1997) (detailing the extensive measures taken by the defendant to ensure his privacy).

¶90 Although the Court gives "lip service" to the necessity of analyzing the facts, it largely fails to do so. For example, paragraphs 30 and 37 contain the critical holdings that the Defendants held an expectation of privacy that society accepts as reasonable. However, the Court neglects to mention the central factual issue of this case: the consensual electronic monitoring of a drug deal by police. Instead, and without considering the nature or purpose of the conversations, the Court issues the sweeping proposition that there is an expectation of privacy in "face-to-face conversations" held in

---

[1] Pursuant to § 45-9-101(1), MCA, a person commits the offense of criminal distribution of dangerous drugs by, inter alia, "*offer[ing] to sell*, barter, exchange, or give away any dangerous drug[.]" (Emphasis added.) The defendants violated this statute by arranging the sale transactions with the informants, who reported the "offer" to police prior to the monitoring. An arrest could have been made without any monitoring. Of course, the police wisely sought additional evidence to bolster their case.

"private settings." Opinion, ¶ 30. This conclusion, disconnected from the facts, *will even prohibit a participant in the conversation from testifying* about what the Defendant said or did, unless a warrant is first obtained. Not even the Defendants are asking for such a broad holding—but that is a consequence of leaving the facts behind. The facts of this case should form the basis of the analysis for the critical legal question before us, and I thus turn to the facts, beginning with those related to the expectation of privacy and the reasonableness of that expectation.

¶91 This was a commercial transaction. In each of the two cases before us, the seller, for the purpose of making a financial profit, offered and then sold a product to a buyer. But for the seller's financial motive, and the buyer's assurance of payment, these parties would not have met at all. It was the business deal, and only the business deal, which brought them together. Goetz was selling methamphetamine—Hamper, marijuana.

¶92 As in the typical commercial transaction, the sellers here offered their product to members of the public—they intentionally exposed and sold their product to customers who were non-confidants. The length of each transaction is reflective of its impersonal and commercial nature as each lasted only moments—similar to other retail purchases. These meetings were not social occasions between friends or family. The exchange of product and cash was made and the parties immediately went their own way, because the only purpose of their meeting—the sale—was completed. Thus, in these transactions, the defendants first "knowingly exposed" their business by offering to sell and then exposed their product during the actual exchange to someone who was not a confidant to them. *See Scheetz*, 286 Mont. at 53, 950 P.2d at 726-27 (explaining that "[w]hat a person

48

knowingly exposes to the public is not protected, but what an individual seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected." (internal quotations omitted)).

¶93 The place of the transaction is also a relevant fact, though not necessarily determinative. *See Siegal*, 281 Mont. at 260, 934 P.2d at 181 (stating that what a person knowingly exposes "even in his own home or office" is not considered private). Goetz invited Trusler, described by the District Court as a "mere visitor," into his home on Main Street and there conducted the brief sales transaction. Hamper met Ms. White first in a parking lot on Main Street, where he got into her car for the brief conversation and sale. For the second sale, the District Court found that White was likewise a "mere visitor" in Hamper's home where the brief sales exchange occurred.

¶94 The Court's analysis wholly ignores the specifics of these circumstances and it is clear that the Court's decision is significantly disconnected from the factual predicate. In fact, this disconnect leads the Court to restate the issue on appeal in a generic form as: "whether society is willing to recognize an individual's subjective expectation that a one-on-one conversation conducted in a private setting is not being surreptitiously electronically monitored and recorded." Opinion, ¶ 31. Accordingly, the Court only considers whether there exists a reasonable expectation of privacy in "a personal conversation held in a private setting[.]" Opinion, ¶ 31. This statement, and others in the opinion, is so broad that it would apply as readily to governmental recording of a conversation among friends or relatives socially gathered around the living room, as to the facts of this case. Indeed, who would disagree that society reasonably expects the

49

government to not record "conversations held in a private setting" such as the confines of one's home during a family Thanksgiving dinner? I certainly would not disagree—but those are not the facts here. The expectation of privacy in a personal family dinner setting is far different than the expectation of privacy in a commercial transaction where a product is sold to a non-confidant in a brief encounter. Although remarkably different, the Court's imprecise analysis treats them as if they are identical—as if the Court is powerless to distinguish between these very different factual scenarios.

¶95 The law, however, does make such distinctions. Commercial transactions made with the public are not the same as social conversations among friends in the living room. Criminal enterprises are not the same as family Thanksgiving dinners. We should recall what Chief Justice Earl Warren wrote about the sale of illegal drugs out of a home. He too realized that these were "commercial" transactions which alter the privacy expectation:

> The fact that the undercover agent entered petitioner's home does not compel a different conclusion. Without question, the home is accorded the full range of Fourth Amendment protections. *See Amos v. United States*, 255 U.S. 313 (1921); *Harris v. United States*, 331 U.S. 145, 151, n. 15 (1947). *But when, as here, the home is converted into a commercial center to which outsiders are invited for purposes of transacting unlawful business, that business is entitled to no greater sanctity than if it were carried on in a store, a garage, a car, or on the street.* A government agent, in the same manner as a private person, may accept an invitation to do business and may enter upon the premises for the very purposes contemplated by the occupant.

*Lewis v. United States*, 385 U.S. 206, 211, 87 S. Ct. 424, 427 (1966) (emphasis added).

Thus, it is not merely the place, but the circumstances and character of a meeting—i.e., all the facts—which are critical to the assessment of the expectation of privacy. We

should not endow criminal enterprises with a blanket expectation of privacy just because they are conducted within a home or within a vehicle. Indeed, a jurist no less concerned about individual rights than Justice William Brennan was very clear about the privacy claims of those engaged in the activities of the defendants here:

> The Fourth Amendment protects against governmental intrusion upon "the sanctity of a man's home and the privacies of life." *Boyd v. United States*, 116 U.S. 616, 630. *However, the occupant can break the seal of sanctity and waive his right to privacy in the premises. Plainly he does this to the extent that he opens his home to the transaction of business and invites anyone willing to enter to come in to trade with him.*

*Lewis*, 385 U.S. at 213, 87 S. Ct. at 428 (J. Brennan, concurring).

¶96 The public and commercial nature of the criminal enterprise at issue here—the sale of illegal drugs to strangers—separates this case from other kinds of crimes, even drug-related, and further illustrates the necessity of a close factual analysis. For instance, a person joining others at a friend's house to smoke pot, though an illegal act, would have a different privacy expectation than a person who undertakes the risk of meeting with a member of the public to consummate a drug transaction. The dynamics of these situations are clearly different, and it is the different dynamics which instruct the analysis under the first two prongs of the unreasonable search and seizure test—(1) actual expectation of privacy and (2) society's willingness to accept the expectation as objectively reasonable. A person simply cannot have the same expectation of privacy when he knowingly exposes illegal drugs for the commercial purpose of selling them to a non-confidant as he does while engaged in private socializing with friends and family. Indeed, as shown below, the Defendants here expressed as much.

51

¶97 Consistent with its approach of over-generalizing, the Court attempts to summarize the statements of the delegates to the 1972 Montana Constitutional Convention in a manner which appears to provide support for its holding, and concludes that the Defendants had a reasonable expectation of privacy because "Montanans continue to cherish the privacy guaranteed them by Montana's Constitution." Opinion, ¶ 35. I certainly do not dispute this general conclusion, and do not dispute the general idea that the delegates to the constitutional convention held privacy in high regard. However, the Court considers only some of the delegates words, and ignores other specifically applicable words altogether, thereby covering up the reality that the delegates' primary concern was over electronic surveillance and eavesdropping undertaken by the government *without the consent of any party*, about which Delegate Campbell's indication that such activity "was really not a need and such activity was not taking place at this time" can be understood, as well as the delegates' actual expressions about the factual scenario at issue here. Montana Constitutional Convention, Verbatim Transcript, March 7, 1972, p. 1682. Delegate Campbell further amplified:

> I feel that with "oral communications" you are not excluding the legitimate law enforcement people, who, with the consent of one party, the person who is being threatened by phone calls and things like this, to act on behalf of the victim. The privacy of that individual certainly could be waived with his or her consent, and there's certainly no privacy toward the obscene caller.

Transcript, p. 1685. And Delegate Dahood added:

> Yes, let me answer that question. First of all, this does not in any way relate to the obscene phone call situation, nor does it relate to the ability of the telephone company to make traces. The logic and reason is this: all personal rights, constitutional or otherwise, may be waived. Lady

52

> A is receiving the obscene phone call. She waives her right and grants the telephone company the right to intercept that communication. The individual that's making the call does not have the right of privacy with respect to violating the law and making the obscene phone calls, so as a consequence, we are not interfering with anyone's rights . . . .

Transcript, p. 1686.

¶98 To be sure, the delegates, as quoted in *Siegal*, 281 Mont. at 276-77, 934 P.2d at 192, condemned "wiretaps," "eavesdropping," "electronic surveillance" and other forms of *nonconsensual* monitoring, yet at the same time spoke approvingly of a party consenting to the monitoring of a telephonic conversation wherein the other party had, under the facts, waived the right to privacy in the communication. The case before us illustrates a similar scenario—consent by one party and facts illustrating no reasonable expectation of privacy on part of the other in the transaction. The delegates clearly distinguished between these two different scenarios, but the Court does not. Neither does the Court acknowledge the delegates' specific views in this regard.

¶99 Consequently, the Court finds a privacy expectation in what the delegates clearly stated was a non-private situation. The Court does not explain how a privacy interest springs forth from a non-private commercial transaction. In paragraph 35, the Court appears to distinguish between the risk that a conversation will be repeated and the risk that the same conversation will be consensually electronically monitored by government agents. However, if this is the Court's distinction, it is without a constitutional difference because society would not consider a privacy interest in a non-private commercial drug transaction to be reasonable. Indeed, our constitutional convention delegates did not, and neither did some of the greatest legal minds of our time, as quoted herein. Accordingly, I

53

would join them and conclude that no "search" took place. *See Hamilton*, ¶ 17 (explaining that where no objectively reasonable expectation of privacy exists a search does not occur).

¶100 However, even assuming *arguendo* that a search did occur, the Court's analysis of the "nature of the State's intrusion" again further ignores the facts of the present case and mischaracterizes the role of consent in our search and seizure jurisprudence. Most notably, while the Court overrules *Brown* on the basis that it "merely paralleled federal jurisprudence," in its discussion of "consent" the Court opts to "use some federal Fourth Amendment analysis in addressing issues under the Montana Constitution" and relies on the Supreme Court case of *Georgia v. Randolph*. Opinion, ¶ 42. The Court's reliance on federal jurisprudence is inconsistent at best and an unfortunate consequence is the twisting of the holding in *Randolph* to fit the issue at hand.

¶101 *Randolph* involved the search of a home despite one of the co-occupant's express refusal to consent to the search. The United States Supreme Court concluded that the refusal of one occupant to consent trumps the consent of a co-occupant and the police may not search the shared quarters. *Randolph*, 547 U.S. at 120, 126 S. Ct. at 1526. The *Randolph* situation cannot fairly be likened to the instant case. As the Court correctly deduces, the item searched here is the conversation. Opinion, ¶ 45. However, a conversation, unlike a home, is not a shared space. Once the conversation commences, it becomes the individual property of each participant. *See Brown*, 232 Mont at 10, 755 P.2d at 1370 (stating that "both participants [have] an equal interest in the conversation . . . ."). Neither participant can prevent the other (absent privilege) from sharing or

54

repeating the conversation because each has full control over it. A conversation is not the same as a dwelling space and, accordingly, consent of both conversationalists is not required in order to monitor the conversation.

¶102 However, by concluding that both parties to an electronically monitored conversation must consent to the monitoring, the Court fails to acknowledge the true distinction at work here: that consensual monitoring is different than "eavesdropping"— the monitoring of a conversation by the government *without* the consent of any party. The failure to honor the informant's consent lumps consensual monitoring with eavesdropping for all constitutional purposes, because the same requirements are imposed for either, even though they are, according to longstanding jurisprudence, clearly constitutionally distinct. In sum, the Court renders the party's "consent" null, giving it no effect whatsoever. "[T]here is a substantial distinction between '[revelations] to the Government by a party to conversations with the defendant' and eavesdropping on conversations without the knowledge or consent of either party to it." *United States v. Karo*, 468 U.S. 705, 716 n.4, 104 S. Ct. 3296, 3304 n.4 (1984). (Bracket in original.) We explain this in *Brown*: "It is important to stress that this holding does not open the floodgates to create an Orwellian society and that the individual is not left without protections against inappropriate electronic eavesdropping." *Brown*, 232 Mont. at 11, 755 P.2d at 1371.

¶103 The Court's conclusion also ignores the High Court's guidance that "[t]he constant element in assessing Fourth Amendment reasonableness in the consent cases . . . is the great significance given to *widely shared social expectations[.]*" *Randolph*, 547 US. at

111, 126 S. Ct. at 1521 (emphasis added). The widely shared social expectation, as this Court accepts in paragraph 35, is that each person assumes the risk that a participant to the conversation may turn around and repeat the conversation. More importantly, we share the social expectation that we assume a person is who he purports to be. *See Brown*, 232 Mont at 11, 755 P.2d at 1371 (explaining that "mistaken trust" is not a defense). However, the Court leaves these social expectations behind and forces the *Randolph* rationale onto a highly distinguishable situation.

¶104 Even assuming that the *Randolph* rationale is appropriately used here, the Court ignores two critical points of that decision: (1) neither defendant "refused" consent here, as in *Randolph*, and (2) the *Randolph* Court expressly stated that the police need not "take affirmative steps to find a potentially objecting co-tenant before acting on the permission they [have] already received." *Randolph*, 547 U.S. at 122, 126 S. Ct. at 1527. The Court today reads into *Randolph* the requirement that the police give each person present an "opportunity to object to the search." Opinion, ¶ 45.[2] However, the Supreme Court expressly refused to require police to take this type of affirmative action, stating: "There is no ready reason to believe that efforts to invite a refusal would make a difference in many cases, whereas every co-tenant consent case would turn into a test about the adequacy of the police's efforts to consult with a potential objector." *Randolph*, 547 U.S. at 122, 126 S. Ct. at 1527-28. The Court conveniently ignores these

[2]The very idea that one engaged in the commercial sale of illegal drugs to a non-confidant must be given the "opportunity to object" before police can monitor the parties' conversation is a flight into the fanciful, perhaps the ludicrous.

portions of the *Randolph* decision—perhaps this is what the Court means by saying it will "use *some* federal Fourth Amendment analysis . . . ." Opinion, ¶ 42 (emphasis added).

¶105 Moreover, by likening the instant case to *Randolph* the Court ends its analysis of the nature of the state's intrusion and fails to consider other pertinent details. First and foremost, the recording did not produce any evidence beyond what the informant herself could have relayed. This fact led the District Court to conclude that the government action here was "not excessively intrusive." The facts clearly distinguish the monitoring here from the "sense enhancing" technologies of the type we addressed in *Siegal*, which we noted could be used to "surreptitiously monitor the heat signatures generated by activities conducted within the confines of [Montanans'] private homes and enclosed structures for the purpose of drawing inferences about the legality of such activities." *Siegal*, 281 Mont. at 274, 934 P.2d at 190. No such capture of private, unexposed information about the defendants was accomplished here. Nothing was recorded that the defendants did not consciously state, and which the informants could not relate as having heard firsthand.

¶106 It could be argued that consensual monitoring enhances the senses of police because officers can hear a conversation which they otherwise could not. However, this distinction is not one of constitutional dimension, because it relates only to the *mode* by which the information is received, not the *content* of that information. Whether the informant testifies, or the officer testifies with the tape, the evidentiary potential is the same. Thus, it is clear that defendants' constitutional privacy claim really boils down to trial strategy: they do not want the daunting task of fighting against the pesky

truthfulness of their very own, recorded words. However, as well explained by Justice Harlan, writing for the United States Supreme Court in *Lopez,* there is no constitutional right in the expectation that a defendant's own words will not be surreptitiously recorded:

> Stripped to its essentials, petitioner's argument amounts to saying that he has a constitutional right to rely on possible flaws in the agent's memory, or to challenge the agent's credibility without being beset by corroborating evidence that is not susceptible of impeachment. For no other argument can justify excluding an accurate version of a conversation that the agent could testify to from memory. *We think the risk that petitioner took in offering a bribe to Davis fairly included the risk that the offer would be accurately reproduced in court, whether by faultless memory or mechanical recording.*

*Lopez v. United States*, 373 U.S. 427, 439, 83 S. Ct. 1381, 1388 (1963) (emphasis added).

¶107 It is true that Justice Harlan later parted ways with the United States Supreme Court on the issue of warrantless consensual monitoring in *White*. His dissent in *White* often serves as fodder for arguments criticizing the practice, and, indeed, this Court quoted it in *State v. Brackman*, 178 Mont. 105, 115, 582 P.2d 1216, 1221 (1978), *overruled*, *Brown*, 232 Mont. at 8, 755 P.2d at 1369. Given that citation, and further, that Justice Harlan's concurrence in *Katz,* 389 U.S. at 361, 88 S. Ct. at 516, is generally regarded as the source of our Court's privacy jurisprudence, his approach in *White* to the issue before us is worth noting. In his *White* dissent, Justice Harlan gave the following test or construct for analyzing this technological issue:

> This question must, in my view, be answered by assessing the nature of a particular practice and the likely extent of its impact on the individual's sense of security balanced against the utility of the conduct as a technique of law enforcement.

*White*, 401 U.S. at 786, 91 S. Ct. at 1143 (J. Harlan, dissenting).

58

¶108 Applying Justice Harlan's construct to the facts of this case yields interesting results. First, the "nature of the particular practice," as discussed above, is not intrusive, as the monitoring here captured nothing more than the informant could also testify about, thus reducing defendants' privacy claim to nothing more than a wish to be tried without the jury hearing a recording of their own words. Secondly, what is the "likely extent of its impact on the individual's sense of security"? Of course, the "extent" of the impact is likewise reduced by the limited information obtained by the monitoring, but this question is more fully answered by other facts from the record, which are most illustrative. As Goetz stated while selling drugs to Trusler:

> [T]he real deal is with this sh\*\*, they are all over. The Feds are f\*\*\*ing everywhere in this town. The DTF, the FBI, there's reason to be super-ultra-f\*\*\*ing-freaked!

¶109 I would suggest that the "likely extent of the impact" of consensual monitoring upon the "sense of security" of people commercially marketing illegal drugs to the public in an environment of active law enforcement is, respectfully, *very* minimal. This activity is a highly risky venture, and, indeed, one engaging in it truly has good reason to be "freaked" because, consistent with Goetz's knowledge of the risk, law enforcement is engaged. Thus, the likely extent of the impact of consensual monitoring upon the defendants' "sense of security," with or without a warrant, is not reasonably significant.

¶110 Lastly, Justice Harlan's construct requires a balancing of these first two factors against the "utility of the conduct as a technique of law enforcement." On this point, few would disagree that, as a technology, this tool is of great utility to law enforcement. In a case involving a wired informant, we acknowledged that "[t]he use of informants has

59

long been recognized as an allowable tool of police investigation." *State v. Reavley*, 2003 MT 298, ¶ 36, 318 Mont. 150, ¶ 36, 79 P.3d 270, ¶ 36. This point was further acknowledged in the Court's questioning of State's counsel during oral argument in this case:

> Counsel: What I am suggesting is that the heightened standards of particularized suspicion that the government would be burdened with if particularized suspicion were imposed absent this Court finding a search *would really jeopardize our ability to use informants effectively* and would basically give people a license to engage in criminal businesses in their homes. That's what I'm suggesting.

> Justice: Counsel, let me ask a broader question. *I think all of us have become accustomed to the notion of, through television and the movies and books about police conduct, police investigation, . . . the use of criminal informants, confidential informants and the use of body wires.* But often times we see [in] those, that the defendants are bad guys, they're mafia, they're organized crime, there's murders involved. Do we really need to allow this technology to come into play, allow this intrusion, when we're talking about a fifty dollar pot buy?

> Counsel: Well, I can see where people would disagree about the government doing that, but the fact of the matter is that this involves the criminal sale of dangerous drugs that the people's representatives have determined to be illegal. And I don't think the Court should get into determining whether one interest is stronger, whether you're dealing with Mr. Goetz involving methamphetamine or Mr. Hamper involving marijuana. [Emphasis added.]

¶111 Truly, it is a different world today, not only in terms of technological advances, but also in the expectation of the use of technology. I would submit, as the questioning italicized above likewise indicates, that our citizens, especially young people in today's society who have been raised in the age of *Law and Order* and *CSI*, would think it unusual that a drug dealer would have a *reasonable* expectation that his conversations during a drug sale to a non-confidant were not being consensually monitored. The drug

60

dealer may have a *subjective* expectation, but it is not an expectation that our society would deem reasonable.

¶112 Moreover, monitoring provides protection for the informant, who risks physical harm to work with police, and provides for accurate recording and preservation of the evidence of the transaction. Thus, for purposes of Justice Harlan's construct, the utility of this technology is very high in the furtherance of the state's compelling state interest in "enforc[ing] its criminal laws for the benefit and protection" of the citizens. *State ex rel Zander v. Dist. Ct.*, 180 Mont. 548, 556, 591 P.2d 656, 660 (1979). The weighing of Justice Harlan's factors therefore results in a conclusion that the utility of the "particular practice" here clearly outweighs the impact upon the defendant's sense of security.

### *Conclusion*

¶113 This case has little to do with Montanans continuing to "cherish the privacy" of their homes, Opinion, ¶ 35, and even less about "one-on-one conversation[s] conducted in a *private setting*," Opinion, ¶ 31 (emphasis added), simply because, in view of the facts, the setting here should not be considered private. A proper focus on the facts reveals that the defendants were engaged in commercial transactions with non-confidants, and we have been careful to explain that our privacy holdings do not necessarily apply to conduct engaged in "for commercial purposes." *Gryczan v. State*, 283 Mont. 433, 455-56, 942 P.2d 112, 126 (1997).

¶114 Rather, this case is about avoiding the truth—the defendants' raising of a privacy claim to keep the truth, that is, the recording of their own words, from the jury and thereby gaining a tactical advantage by escaping the strong evidence of their crimes.

They want this result despite the fact they are informed of the active police involvement to the point of being "super ultra freaked out" about local police presence and nonetheless assumed the high risk of exposing their trade and their wares through multiple contacts with non-confidants. Their actions were not consistent with the desire for privacy. Indeed, I believe it is untenable for the Court to conclude that society would find reasonable the privacy claims against the consensual monitoring of such actions. The District Court rightly concluded that society would not find this connived claim reasonable. There is not only no indication that the Declaration of Rights was intended to be applied to such risky, non-private behavior, but the debates demonstrate just the opposite. The Court's conclusion to the contrary results, in my view, to the cheapening of our "genuine liberties," about which the United States Supreme Court clearly warned. *On Lee*, 343 U.S. at 754, 72 S. Ct. at 971. Our right of privacy has been hijacked by those engaging in activities which the right was clearly not meant to protect, and has thus been devalued—becoming the new refuge of meth dealers selling to the public by means they well knew risked law enforcement involvement. The delegates to the Constitutional Convention did not countenance such a distortion of the right they found "essential to the well-being of a free society."

¶115 And I would not, either. I dissent.

¶116 In response to the concurrences by Justice Cotter and Justice Leaphart, I appreciate that Justice Cotter's concurrence at least recognizes the commercial nature of the facts, something the Court's opinion does not do. However, I must disagree with her suggestion, made also by Justice Leaphart's concurrence, that the analysis herein "is

intended to apply only to those transactions that are criminal in nature." J. Cotter, concurrence ¶ 125. As indicated by the discussion in paragraph 96 herein, and the example therein—that those gathering to smoke pot together, though a criminal act, would nonetheless have a different expectation than those engaged in the actions in this case—the criminal nature of the transaction does not control the outcome. As the Court recognizes in paragraph 29, the law requires that the expectation of privacy be determined by "looking at the particular facts of the case." That is precisely what this dissent advocates, without regard to the legality of those facts. It bears repeating, however, as recognized by the esteemed jurists quoted herein, that factual considerations, such as opening one's house for commercial transactions, inevitably impacts the privacy analysis. Neither Justice Cotter nor Justice Leaphart has any answer to the collective wisdom expressed by these jurists on these issues.

¶117 I also disagree with Justice Cotter's statement that the analysis would "gut any expectation of privacy one might reasonably have in his commercial conversation[.]" J. Cotter, concurrence ¶ 125. Again, we should be careful about making broad statements disconnected from the facts and the law. In addition to the commercial nature of the transaction, there are many additional facts, varying in each case, which our law requires to be considered. For purposes of brevity, no doubt, Justice Cotter's concurrence does not consider the additional facts about this transaction. However, the facts are critical under our law. For example, is the expectation of privacy in a commercial transaction which takes place at a crowded garage sale the same as one consummated in a closed office? Unless we are going to decide cases without regard to the "particular facts of the

63

case," these factual distinctions should matter. Indeed, the law requires that we determine whether a claimed expectation of privacy is one society believes to be reasonable. The only way we can do so is by considering how society views the facts of the matter. If we are properly applying the law to the facts, then some commercial transactions would be viewed by society as private, and others would not. Our duty is to decide one case at a time, based upon the particular facts.

¶118 Justice Leaphart's concurrence advocates that agents of the state should not monitor any conversation without a warrant, "no matter what the setting," even those conversations which occur "outside a private setting." J. Leaphart, concurrence ¶ 57, 59. Under this approach, all conversations, wherever and however conducted, would be blanketed with a privacy right. Courts would no longer need to consider the "particular facts of the case." This may be what the author desires, but is categorically not a principle of American law. No jurisprudential authority can be cited for it. Although the concurrence cites Justice Harlan's dissent in *White*, Justice Harlan was clearly not advocating for the extreme position taken by the concurrence, asserted to be necessary for a "free society." J. Leaphart, concurrence ¶ 58.

¶119 Such notions of a "free society" are not consistent with the free society established by the constitutional history of this country and state. As explained herein, this dissent joins the position taken by the U.S. Supreme Court on electronic monitoring under the federal constitution. This Court likewise interpreted the Montana Constitution for the past twenty years and, more importantly, the delegates of the 1972 Montana Constitutional Convention took the position of this dissent. Further, and which should

give the Court pause, the high courts of our sister states, consistent with federal authority, have repeatedly reached the conclusion advocated by this dissent when interpreting their state constitutions. *See Hammond v. State*, 354 So. 2d 280, 292-93 (Ala. Crim. App. 1977); *Smithey v. State*, 602 S.W.2d 676, 679 (Ark. 1980); *People v. Phillips*, 711 P.2d 423, 437 (Cal. 1985); *People v. Velasquez*, 641 P.2d 943, 949 (Colo. 1982); *State v. Grullon*, 562 A.2d 481, 489 (Conn. 1989); *Morningstar v. State*, 428 So. 2d 220, 221 n.1 (Fla. 1982), *cert. denied*, 464 U.S. 821 (1983); *Green v. State*, 299 S.E.2d 544, 546 (Ga. 1983); *State v. Lester*, 649 P.2d 346, 350-51 (Haw. 1982); *People v. Richardson*, 328 N.E.2d 260, 264 (Ill. 1975); *Lawhorn v. State*, 452 N.E.2d 915, 918 (Ind. 1983); *Carrier v. Commw.*, 607 S.W.2d 115, 117 (Ky. App. 1980); *State v. Reeves*, 427 So. 2d 403, 410 (La. 1983); *Lee v. State*, 489 So. 2d 1382, 1386 (Miss. 1986); *People v. Collins*, 475 N.W.2d 684, 698 (Mich. 1991); *State v. Engleman*, 653 S.W.2d 198, 199 (Mo. 1983); *State v. Kilgus*, 519 A.2d 231, 240-41 (N.H. 1986); *State v. Levan*, 388 S.E.2d 429, 438 (N.C. 1990); *State v. Geraldo*, 429 N.E.2d 141, 145-46 (Ohio 1981); *Commw. v. Blystone*, 549 A.2d 81, 87-88 (Pa. 1988); *State v. Ahmadjian*, 438 A.2d 1070, 1081-82 (R.I. 1981); *Clariday v. State*, 552 S.W.2d 759, 768-69 (Tenn. Crim. App. 1976); *State v. Boone*, 581 P.2d 571, 573-74 (Utah 1978); *Blackburn v. State*, 290 S.E.2d 22, 32 (W. Va. 1982). Still further, the American Bar Association Criminal Justice, Electronic Surveillance of Private Communications Standard 2-5.1(a), states as follows:

> A law enforcement officer should be permitted to intercept the contents of a private communication with the consent of one of the parties to the communication without a court order, provided that the officer intercepts and uses the communication in the proper performance of the officer's official duties.

¶120   These authorities and sources make clear that Justice Leaphart's "free society" theory runs counter to our nation and state's constitutional principles as enunciated in countless cases.  Indeed, the concurrence's theory is more akin to traditional anarchist thought than our constitutional history:  "[A]narchism is based upon the idea of the sovereign individual, the belief that individual conscience and the pursuit of self-interest should not be constrained by any public body or collective authority."  Andrew Heywood, *Key Concepts in Politics*, 46, (MacMillan Press 2000).  Though we all desire privacy, our system was not formed upon, nor has ever endorsed, an absolute privacy right premised upon the sovereign individual which would permit a limitless pursuit of self-interest.  However good it may sound in theory, doing "whatever one wants" without government interference is not a free society.  It is anarchy.  Such thinking would not have allowed American free society to survive for over two hundred years.  Under our constitutions, freedom means the right to pursue one's own life within the confines of the solemn principles upon which the democracy was founded.

¶121   Upon the collective judgment of the U.S. Supreme Court, the delegates to the 1972 Montana Constitutional Convention, the justices of the Montana Supreme Court for the past twenty years, and the high courts of our sister states, I would affirm the District Court.


/S/ JIM RICE

Justice John Warner dissents.

¶122   I emphatically agree with the dissent of Justice Rice.  The only real world result of the Court's decision today will be to increase the use of a perpetrator's home for all types of criminal transactions.

¶123   For the sake of safety, law enforcement might opt to continue equipping officers and citizen informants with electronic transmitting devices when they undertake the dangerous task of securing evidence against drug dealers, white-slavers and other offenders, who naturally decline to conduct their flagitious business out in the open.  It is possible that such recordings could be used in redirect examination.  *U.S. v. Burns*, 432 F.3d 856, 860 (8th Cir. 2005).  And, in the event a criminal defendant chooses to testify and contradicts the testimony of a State's witness to a criminal transaction, a recording of what actually happened might come in handy for impeachment purposes.  *See e.g. U.S. v. Leon*, 468 U.S. 897, 910, 104 S. Ct. 3405, 3414 (1984); *Walder v. U.S.*, 347 U.S. 62, 65, 74 S. Ct. 354, 356 (1954); *Harris v. New York*, 401 U.S. 222, 226, 91 S. Ct. 643, 646 (1971).

/S/ JOHN WARNER

Justice Patricia O. Cotter concurs.

¶124   The Dissent, which stands for the proposition that there is no expectation of privacy in a commercial transaction where a product is sold to a non-confidant (Dissent,

¶ 94), has surface appeal on a first read.  However, in my judgment, the analysis is problematic, wherever on the spectrum of application it might fall.

¶125   While the Dissent complains that the Court's decision is unnecessarily broad and sweeping, so too is its own reach.  If the Dissent's rationale is intended to apply equally to the criminal and the law-abiding alike—which I submit, it must—then it stands for the proposition that virtually any commercial transaction may be surreptitiously recorded without a warrant and with only one party's consent, with the resulting recording being admissible in evidence against the speaker.  It would, in essence, gut any expectation of privacy one might reasonably have in his commercial conversation, regardless of the lawfulness of the transaction.  If, on the other hand, the analysis is intended to apply to only those transactions that are criminal in nature, as is repeatedly suggested throughout the Dissent (i.e., Dissent, ¶ 109, addressing the impact of such monitoring upon "people commercially marketing illegal drugs to the public . . . in a highly risky venture"; Dissent, ¶ 114, the Declaration of Rights was not intended "to be applied to such risky non-private behavior," etc.), then it runs afoul of our duty to treat all persons the same before the law, without distinction for criminal/non-criminal behavior.  *See* Opinion, ¶ 32.  Respectfully, either result is unacceptable.

¶126   It bears repeating that the Court is not imposing an outright ban on electronic monitoring of conversations with the consent of only one participant.  All we are saying is that there should be sufficient probable cause that a criminal enterprise is about to occur to support the issuance of a warrant allowing such monitoring.  In my view, this is a far preferable alternative than an expansive rule which would permit the introduction

into evidence of surreptitious non-consensual recordings conducted in virtually any and every commercial setting.  I therefore concur.

/S/ PATRICIA COTTER

Justice James C. Nelson joins in the Concurrence of Justice Patricia O. Cotter.

/S/ JAMES C. NELSON